# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

RONALD WAYNE TAYLOR,

Petitioner,

vs.

PAM AHLIN, Executive Director of
Coalinga State Hospital,

Respondent.

Civil No.    10cv1122-LAB (PCL)

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE
JUDGE RE DENIAL OF PETITION
FOR WRIT OF HABEAS CORPUS**

This Report and Recommendation is submitted to United States District Judge Larry A. Burns pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

## I.

## FEDERAL PROCEEDINGS

Ronald Wayne Taylor (hereinafter "Petitioner"), a person civilly committed to the California Department of Mental Health under the authority of California Welfare and Institutions Code § 6600 et seq., commonly known as the Sexually Violent Predator Act ("SVP Act"), is proceeding pro se with a First Amended Petition for a Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. (Doc. No. 4.) Petitioner claims he was committed in violation of the state and federal constitutions because: his commitment was based

on the illegal use of underground regulations (claim one); he received ineffective assistance of counsel (claim two); the burden of proof rests on Petitioner to prove he is not a sexually violent predator rather than on the government to prove that he is (claim three); and the SVP Act violates equal protection (claim four) and ex post facto principles (claim five).  (First Amended Petition "FAP" at 6-35.[1])

Pam Ahlin, the Executive Director of Coalinga State Hospital (hereinafter "Respondent"), proceeding by and through the California Attorney General, has filed an Answer to the FAP along with an attached Memorandum of Points and Authorities in support thereof, and has lodged portions of the state court record with the Court.  (Doc. No. 9.)  Respondent contends that claim one does not raise a federal question and that Petitioner has failed to exhaust his state court remedies as to claims two and five, but that those claims should be denied because they are without merit.  (Memorandum of Points and Authorities in Support of Answer "Ans. Mem." at 3-4.)  Respondent also contends that, with respect to the claims presented here which were addressed on the merits by the state court, habeas relief is not available because the state court's adjudication was neither contrary to, nor involved an unreasonable application of, clearly established federal law.  (Id. at 4-28.)

Petitioner has filed a Traverse with an attached Memorandum of Points and Authorities in support thereof.  (Doc. No. 19.)  Petitioner contends that all his claims have been properly exhausted and they all merit federal habeas relief.  (Memorandum of Points and Authorities in Support of Traverse "Trav. Mem." at 9-34.)

For the following reasons, the Court finds that Petitioner is not entitled to habeas relief as to any claim presented in this action.  Accordingly, the Court **RECOMMENDS** the First Amended Petition be **DENIED**.

/ / /

/ / /

---

[1]  Because Petitioner has attached additional pages to the First Amended Petition, and because his Traverse is not sequentially paginated, the Court will refer to the page numbers assigned by the Court's electronic case filing system when providing citations to those documents.

## II.

### STATE PROCEEDINGS

On November 7, 2006, the San Diego County District Attorney filed a Petition for Involuntary Treatment of a Sexually Violent Predator (hereinafter "SVP petition") in the San Diego County Superior Court, which sought Petitioner's commitment to the custody of the California Department of Mental Health for an indeterminate term.  (Lodgment No. 8, Clerk's Tr. ["CT"] at 1-4.)  Attached to the SVP petition were supporting documents which indicated Petitioner had suffered convictions for forcible rape in 1975, 1979 and 1989.  (Id. at 5-56.)  The SVP petition alleged that Petitioner has a currently diagnosed mental disorder which makes him a danger to the health and safety of others in that it is likely he will engage in sexually violent predatory criminal behavior if released from the state hospital.  (Id. at 3.)

A probable cause hearing was held on March 6-7, 2007, at which the trial judge found probable cause to believe the allegations in the SVP petition were true.  (CT 130-31.)  A jury trial commenced on June 11, 2007.  (CT 136.)  On June 13, 2007, the jury returned a verdict of true, and Petitioner was immediately committed to the State Department of Mental Health for an indeterminate period.  (CT 142.)

Petitioner appealed his commitment to the California Court of Appeal, raising the same claims presented in the instant First Amended Petition, with the exception of several portions of the ineffective assistance of counsel claim presented here as claim two.  (Lodgment Nos. 1-3.)  The appellate court, in an unpublished opinion, affirmed the judgment of commitment.  (Lodgment No. 4, People v. Taylor, No. D052948, slip op. (Cal. Ct. App. Mar. 25, 2009).)  On May 4, 2009, Petitioner filed a petition for review of the appellate court's decision with the California Supreme Court, in which he raised claims one, three and four presented in the First Amended Petition here.  (Lodgment No. 2.)  On June 10, 2009, the California Supreme Court denied the petition with an order which stated in full: "Petition for review denied."  (Lodgment No. 6.)

/ / /

/ / /

### III.

### **EVIDENCE ADDUCED AT TRIAL**

Dana Evan Putnam, a clinical and forensic psychologist in private practice, testified that he reviewed Petitioner's records from the Department of Mental Health, as well as police, probation, and court records relating to his prior criminal offenses, along with psychological and psychiatric reports filed by previous evaluators. (Lodgment No. 7, Reporter's Transcript ["RT"] at 20, 31-33.) He also met with Petitioner for about an hour and forty-five minutes. (RT 33-34.) Doctor Putnam explained to the jury that there are three parts to an SVP evaluation: (1) review of the person's criminal history to determine whether it meets the statutory criteria; (2) determining whether the person suffers from a mental disorder which predisposes the person to the commission of sexually violent acts; and (3) making a determination regarding how likely the person is to commit future sexually violent and predatory acts as a result of that mental disorder. (RT 26.)

Doctor Putnam inventoried Petitioner's criminal history for the jury, and testified that it met the statutory criteria and therefore satisfied the first part of the SVP evaluation. (RT 51.) Petitioner was first arrested at age 13 in 1967 for loitering and burglary, resulting in three days in jail. (RT 37.) Petitioner was arrested for burglary and resisting arrest in 1972, and arrested again in 1974 for burglary and refusing to provide information. (RT 37.) His first sex offense occurred in 1975, when he was convicted of rape by force. (RT 38, 41.) In that incident, a woman was walking to work in the morning when Petitioner rode up to her on a bicycle and told her, "Run, I'm going to kill you," or "Run, I'm going to hurt you." (RT 40.) Petitioner chased the woman down, knocked her to the ground, dragged her into the bushes, put a pillowcase over her head, threatened to kill her if she screamed, and raped her. (RT 40-41.) The victim screamed when she saw a nearby police officer and Petitioner was immediately apprehended. (RT 41.) He was convicted of forcible rape on June 31, 1975, in the Los Angeles Superior Court, and sentenced to three years in state prison. (Id.)

Petitioner was released on parole on July 5, 1978, and forcibly raped another woman on November 21, 1978. (RT 41-42.) In that incident, Petitioner, who was 24 years old at the time,

approached a 51-year-old woman in a parking lot while wearing a ski mask and a hood.  (RT 42.)  Petitioner told the victim, "I'm going to hurt you," put a rope or cord around her neck, and choked her until she lost consciousness and hit the ground.  (<u>Id.</u>)  He dragged her into his car and drove a short distance to a construction area.  (<u>Id.</u>)  Petitioner vaginally raped the victim after she regained consciousness, and unsuccessfully attempted anal penetration.  (<u>Id.</u>)  When Petitioner's car became stuck in the mud, he told the victim to lie in the car for half an hour and ran away.  (<u>Id.</u>)  He went to a nearby restaurant, was seen by a waitress throwing his muddy shoes in the restaurant's dumpster, and then called the police and reported that his car had been stolen.  (<u>Id.</u>)  Petitioner was convicted of rape by force, kidnapping, and assault with a deadly weapon in San Mateo County Superior Court as a result of that incident, and was sentenced to nine years in state prison.  (RT 43,)

Petitioner was released on parole on March 22, 1984, and committed a third forcible rape on June 27, 1989.  (<u>Id.</u>)  In that incident, which occurred in San Diego, Petitioner approached a woman in the parking lot of a taco stand and asked her if she had a pipe and if she smoked.  (RT 43-44.)  She told him "no," and as she started to walk away Petitioner held a knife to her back and told her that she was going to go with him.  (RT 44.)  He walked her to a residence, entered, and asked her, "Do you want to be fucked standing up?"  (<u>Id.</u>)  He undressed her, penetrated her while standing, then threw her to the ground and raped her again.  (<u>Id.</u>)  He also penetrated her anally with his finger and orally copulated her.  (<u>Id.</u>)  Toward the end the woman asked if she could leave, to which Petitioner replied, "No, not until I'm done with you."  (<u>Id.</u>)  After the rape, he asked her, "Do you feel like you've just been fucked?", to which she replied, "No, I feel like killing you."  (<u>Id.</u>)  Petitioner was convicted in San Diego Superior Court of rape by force as a result of that incident, and was sentenced to twenty-eight years in state prison.  (<u>Id.</u>)  Near the completion of that sentence, Petitioner was referred through the Department of Mental Health for evaluation as an SVP.  (RT 45.)  On January 25, 2005, he was found to be an SVP and committed to the state hospital for a term of two years.  (<u>Id.</u>)

Doctor Putnam testified that the second part of the SVP evaluation had been satisfied in that he had diagnosed Petitioner as suffering from Paraphilia not otherwise specified, the general

criteria of which involves intense or current sexual fantasies, urges, or behaviors over a period greater than six months that involve nonconsenting adults. (RT 50-51, 53.) This was based on the finding that Petitioner's criminal sexual behavior shows a clear history of recurrent sexual fantasies, urges and behaviors involving nonconsenting adults over a period longer than six months, which he did not stop engaging in despite having been convicted and imprisoned twice. (RT 52.) In addition, Dr. Putnam observed deviant aspects of the rapes not found in normative behavior, including maintaining sexual arousal despite or perhaps because of extreme violence on the victims, and the choice of one victim who was more than twice his age. (RT 52-53.) There was also a sadistic element to the rapes, and although Petitioner had previously been diagnosed as having a sadistic disorder, Dr. Putnam said he did not diagnose Petitioner which such a disorder because his behavior was not completely focused on torturing the victims. (RT 53.)

Doctor Putnam diagnosed Petitioner with antisocial personality disorder, which he said aggravates the Paraphilia diagnosis. (RT 54, 59.) The antisocial personality diagnosis was based on Petitioner's history and behavior, which showed a pervasive pattern of disregard for, and violation of, the rights of others beginning at age fifteen. (RT 56.) This pattern includes a failure to conform to social norms as shown by his criminal record; deceitfulness indicated by repeated lying, including the use of aliases with the police; and impulsivity shown by his criminal sexual behavior, his behavior while incarcerated which included fighting and an escape attempt, as well as recent impulsive behavior while committed at the state hospital in which he became focused on a female staff member and had inappropriately spoken to her, touched her clothing, and told her he was in love with her and wanted to marry her. (RT 56-58, 70.) The pattern also includes Petitioner's history of consistent irresponsibility in that he has no record of maintaining a job for any length of time, as well as his lack of remorse in that he has never acknowledged that he raped anyone, but has blamed the victims by contending they were prostitutes or had misidentified him as the rapist. (RT 57.)

Doctor Putnam testified that he observed a predatory aspect to Petitioner's behavior, in that Petitioner chose strangers for victims, suggesting that any future offense would be predatory

in nature as well.  (RT 61.)  In addition, Dr. Putnam conducted a risk assessment which supported a conclusion that Petitioner is expected to predatorily reoffend in the future, and treatment in the community would not reduce that risk.  (RT 62-72.)  He used an instrument called Static-99, made up of risk factors which do not change once they are identified.  (RT 63.)  These factors include: (1) youth; (2) whether the person has lived with a lover for longer than two years; (3) whether the conviction involved a non-sexual component such as robbery; (4) prior nonsexual violence; (5) prior sex offenses; (6) prior prison sentences; (7) convictions for noncontact sex offenses; and (8) relationship to the victim.  (RT 64-65.)  Other considerations which informed Dr. Putnam's opinion that Petitioner posed a risk included: (1) intimacy deficits as indicated by his criminal history and lack of commitment to long-term relationships; (2) problems with sexual self-regulation as indicated by a history of numerous sexual partners numbering between 50 and 80, including a deviant interest in nonconsensual sex; (3) a history of attitudes tolerant of sexual assault, which includes blaming the victims and denying that he caused them harm; (4) lack of cooperation with supervision shown by parole violations, prison rule violations and difficulty with hospital staff; and (5) problems with self-regulation and lack of insight, including his belief that he does not suffer from a disorder related to sexual offending and has shown no interest in participating in sex offender treatment.  (RT 69-78.)  On cross-examination, Dr. Putnam admitted that certain tests ordinarily used by psychiatrists, as opposed to psychologists like himself, to diagnose personality disorders were not given in this case, and are not typically given in SVP evaluations.  (RT 96-98.)  Doctor Putnam stated that this was mainly due to the fact that there has been a protocol established for SVP evaluations, and although he said there is some leeway in regard to what tests are administered, he also stated that such tests "are not the kind of tests that really are helpful in answering the questions that we're asked to answer in these evaluations, so they are not routinely used by anybody."  (RT 104-05.)

Petitioner was called as a witness by the prosecution.  He testified that he has been at the state hospital for the last two years, and disagreed with Dr. Putnam's testimony that he had not been involved in a treatment program because, as he understands it, "the whole hospital is

supposed to be sex offender treatment." (RT 115-18.)  He also said there was a delay to begin treatment due to the fact that the hospital had just opened and was crowded, and that he was on the "waiting list to get on the waiting list" to begin phase one treatment.  (RT 119-24.) Nevertheless, he said he considered himself actively programming in phase one of the five-phase treatment plan because he was currently taking a computer class, lifting weights, going to the library, and attending music therapy.  (Id.)  Petitioner testified that he was not involved in the first rape for which he was convicted, but that someone else committed the rape and he was wrongly convicted.  (RT 124-26.)  With respect to the second rape conviction, he said his car was stolen and he got a ride to a restaurant where he called the police.  (RT 126.)  He admitted to having been arrested and convicted on that occasion, but claimed he had nothing whatsoever to do with that rape.  (RT 126-27.)  When asked about the coincidence of twice being falsely convicted of rapes committed by someone else, he stated that it was a result of the fact that he suffered from bad luck.  (RT 127, 137.)

With respect to the third rape conviction, Petitioner acknowledged that he knew the victim, but claimed she was a prostitute.  (RT 129.)  He denied raping her and said he paid her cocaine in exchange for sex.  (Id.)  Petitioner stated that he was arrested on another occasion, although not convicted, when he was flagged down by a prostitute on his way home from work, told her he did not want sex but agreed to buy her food since she said she was hungry, and she snatched his money and ran.  (RT 129-30.)  He grabbed her and took his money back, but the police intervened and arrested him when they saw him holding her and picking up his money. (RT 130-31.)  He admitted having had about 80 sexual partners during his lifetime, but said less than five of those were prostitutes, and stated that he had slept with about 80 women during a two-year period between 1987-89 when he was body-building and working as a stripper.  (RT 133-35.)

Petitioner testified that he did not think he had any type of mental disorder, and that he possessed enough will power to control his passions and urges, which he characterized as normal in any case.  (RT 136-37.)  He denied ever being involved in serious misconduct while in prison, although he admitted he had received about twenty-five disciplinary write-ups.  (RT 137-44.)

He also denied any inappropriate behavior towards the female staff member at the state hospital mentioned by Dr. Putnam, but explained that the staff member in question had tried to seduce him, and that the hospital pressured her to report their contact as inappropriate.  (RT 144-46.) He said the staff member sang and danced for him and told him that she could be his soulmate, and he believed they would be together now but for interference by the hospital.  (RT 145-46.) He denied every raping or harming a woman, and said he would never harm a woman because he would not want anyone to harm his mother or sister.  (RT 149-50.)

John Hupka, a psychologist in private practice, testified that he conducted an evaluation of Petitioner in order to determine whether he met the three criteria for commitment as a SVP, as state law requires two evaluations prior to commitment under the SVP law.  (RT 107-08, 214.)  In preparing his evaluation, Dr. Hupka met with Petitioner for about an hour, reviewed records relating to his criminal offenses, and reviewed his state hospital records.  (RT 213-14.) Doctor Hupka opined that Petitioner's criminal history satisfied the first criteria based on the criminal offenses outlined by Dr. Putnam, and in addition provided information regarding the incident Petitioner had mentioned during his testimony where he was arrested but not convicted. (RT 219, 221.)  According to the records, that incident involved Petitioner asking the victim, a five-months pregnant woman, if she wanted a ride, and then telling her, "Shutup, and if you do what I want you won't be hurt."  (RT 219.)  Petitioner drove the victim to an alley where he told her, "You're going to give me some, bitch."  (Id.)  When she attempted to run, they struggled and Petitioner removed her clothes.  (Id.)  The victim continued to fight, and Petitioner fled when police officers intervened.  (Id.)  Petitioner explained the incident to his probation officer by saying that he and the victim were partying and having fun when the victim attempted to grab his money, and that he was attempting to restrain the victim when her clothes somehow came off.  (RT 220.)  Doctor Hupka testified that when he asked Petitioner about his offenses, Petitioner at first simply denied committing any of the rapes for which he had been convicted. (Id.)  When asked about the nature of the violence involved, Petitioner indicated that the offenses were not that bad and that he never hurt the victims.  (RT 221.)  Doctor Hupka said that Petitioner took "great umbrage" at the suggestion the rapes involved violence because Petitioner

did not "stab them" or "rip their guts out," although he acknowledged that maybe the victims' dignity may have been hurt a little bit.  (Id.)  Doctor Hupka opined that these statements were a roundabout way of acknowledging he committed the offenses.  (Id.)

With respect to the second criteria, Dr. Hupka opined that Petitioner suffers from Paraphilia marked by a disturbed desire for sexual gratification by sadistically raping nonconsenting females.  (RT 221-25.)  He said that Petitioner's disorder is quite rare, as most people who engage in rape never rape again, but Petitioner reoffends because sadistic rape defines his sexual orientation.  (RT 226-27.)  Doctor Hupka also found that Petitioner suffers from antisocial personality disorder, although he said that alone does not satisfy the criteria for an SVP in that about 75% of all prisoners are antisocial.  (RT 228.)  Doctor Hupka opined that the combination of Petitioner's antisocial personality with his Paraphilia provides a formidable obstacle to change and an obstacle to participation in treatment programs, which further supports his opinion that the third criteria has been satisfied in that it is likely Petitioner will engage in sexually violent predatory criminal behavior if released.  (RT 229-38.)  Doctor Hupka testified that the hospital records indicate that Petitioner has not participated in treatment during his two-year commitment to the state hospital, and that the programs Petitioner has participated in were not related to SVP treatment.  (RT 238-51.)

The court took judicial notice of Petitioner's three rape convictions.  (RT 265.)  The People rested, after which the defense immediately rested without presentation of evidence.  (RT 265-66.)  The jury was instructed (RT 269-78), heard closing arguments (RT 279-97), and deliberated about forty-five minutes before returning a true finding.  (RT 305-08; CT 141-42,) Petitioner was immediately committed to the State Department of Mental Health for an indeterminate period.  (CT 142.)

## IV.

## PETITIONER'S CLAIMS

(1)  Petitioner was committed based on the use of illegal underground regulations in violation of federal due process because the SVP commitment protocol was not enacted through the rule-making process of the California Administrative Procedures Act.  (FAP at 6-10.)

(2)  Petitioner was deprived of his Sixth Amendment right to the effective assistance of counsel because his counsel failed to: (a) file a motion to have the SVP petition dismissed based on the use of illegal underground regulations; (b) object to testimony as to statements he made regarding his prior offenses; (c) object to the use of the Static-99 actuarial instrument; (d) retain an expert witness; and (e) argue that the SVP petition was untimely.  (FAP at 11-16.)

(3)  The SVP law impermissibly places the burden of proof on Petitioner to prove that he is no longer dangerous in order to end his indefinite detention, rather than on the government to prove that he continues to present a danger, in violation of federal due process.  (FAP at 17-23.)

(4)  The SVP law violates state and federal equal protection guarantees.  (FAP at 24-32.)

(5)  The SVP law violates state and federal ex post facto principles.  (FAP at 33-35.)

## V.

## **DISCUSSION**

For the following reasons, the Court finds that Petitioner is not entitled to habeas relief as to any claim presented.  The Court therefore **RECOMMENDS** that the First Amended Petition be **DENIED**.

## A.     Standard of Review

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

The Petition was filed after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (West 2006).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases[]" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. An unreasonable application may also be found "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . . ." Williams, 529 U.S. at 412. In order to satisfy § 2254(d)(2), a federal habeas petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest are objectively unreasonable. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

The Supreme Court has indicated that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

1    correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. __, 131 S.Ct. 770, 786

2    (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004).)  "As a condition for

3    obtaining habeas corpus from a federal court, a state prisoner must show that the state court's

4    ruling on the claim being presented in federal court was so lacking in justification that there was

5    an error well understood and comprehended in existing law beyond any possibility for

6    fairminded disagreement." <u>Harrington.</u> 131 S.Ct. at 786-87.  "If this standard is difficult to meet,

7    that is because it was meant to be." <u>Id.</u> at 786.  "It preserves authority to issue the writ in cases

8    where there is no possibility fairminded jurists could disagree that the state court decision

9    conflicts with this Court's precedents." <u>Id.</u>

10   **B.      Petitioner is Not Entitled to Habeas Relief as to Claim One.**

11          Petitioner contends in claim one that he was committed based on the use of illegal

12   underground regulations in the evaluation and screening process in violation of federal due

13   process.  (FAP at 6-10.)  Specifically, he alleges that the commitment protocol used in his case

14   was "improperly prepared in conformity with a standardized assessment protocol that should

15   have been, but was not, enacted as a regulation under the provisions of the administrative

16   procedures act." (<u>Id.</u> at 7.)  In other words, Petitioner contends that the failure to formally adopt

17   the SVP commitment protocol through the state Administrative Procedures Act via the

18   appropriate rule-making process renders it void, and therefore he has not been legally committed

19   to the Department of Mental Health.  In support of this claim, Petitioner argues that a state court

20   ruling upholding that portion of the SVP protocol which provides that he has no right to the

21   presence of counsel at the mental health evaluations, "contradicts the well established Discovery

22   Act." (<u>Id.</u> at 8.)  Although Petitioner appears to present this as an example as to why adopting

23   the SVP protocol through the rule-making process has created a conflict with other provisions

24   of state law, Respondent reads this allegation as presenting a separate, unexhausted federal claim

25   alleging denial of right to counsel during his meetings with Drs. Hupka and Putnam.  (Ans.

26   Mem. at 7-8.)

27          Respondent's main contention with respect to claim one is that Petitioner has not stated

28   a federal claim regarding the use of underground regulations, but has at best alleged a violation

of state law.  (Ans. Mem. at 7.)  Respondent also argues that the aspect of claim one alleging a denial of the right to counsel at the mental health evaluations should be denied on the merits irrespective of Petitioner's failure to present it to the state court.  (Id. at 3, 7-8.)

Petitioner presented claim one to the state supreme court in a petition for review in the same manner it is presented in the First Amended petition, although without mention of a right to counsel during mental health evaluations.  (Lodgment No. 5 at 2-3.)  That court issued an order which stated: "Petition for review denied."  (Lodgment No. 6.)  Because the California Supreme Court did not articulate its rationale for denying the claim, this Court applies the following rebuttable presumption: "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991).

Petitioner presented the same claim to the state appellate court on direct review.  (Lodgment No. 1 at 18-36.)  The appellate court affirmed Petitioner's commitment in an unpublished opinion.  (Lodgment No. 4.)  This Court will therefore determine whether the state appellate court opinion rejecting the claim on the merits was objectively reasonable within the meaning of 28 U.S.C. § 2254(d).  Ylst, 501 U.S. at 803-06.

Before turning to the merits of Petitioner's claim, the state appellate court noted that on August 15, 2008, the Office of Administrative Law issued a determination that the SVP protocol constituted an "underground regulation" because it should have been but was not adopted pursuant to the Administrative Procedures Act.  (Lodgment No. 4, People v. Taylor, No. D052948, slip op. at 3, n. 4.)  The appellate court addressed Petitioner's claim, stating:

> Taylor contends that the [Department of Mental Health] determines who is an SVP under [California Welfare and Institutions Code] section 6601 based on a handbook of procedures not enacted under the Administrative Procedures Act (APA).  [Footnote omitted]  The Office of Administrative Law determined the handbook contained numerous underground regulations.  [Footnote omitted]  Taylor contends, "the district attorney lacked the authority to file a petition for commitment and, therefore, the trial court lacked the authority to conduct a probable cause hearing, a trial, or to commit (him)."  He claims that he was illegally recommitted and seeks reversal of the commitment order and his immediate release.
>
> Under section 6601, subdivision (a)(1), "an individual who is in custody under the jurisdiction of the Department of Corrections and Rehabilitation, and who is either serving a determinate prison sentence or whose parole has been

revoked," may be determined by the secretary of the department to be a potential SVP. An SVP is defined as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) When a potential SVP is identified, "the secretary shall, at least six months prior to that individual's scheduled date for release from prison, refer the person for evaluation in accordance with this section." (§ 6601(a)(1).) When this occurs, the potential SVP is referred to two mental health evaluators, who must agree that the individual has a diagnosed mental disorder and is likely to engage in acts of sexual violence absent appropriate treatment in custody. (§ 6601, subds. (b), (d), & (i).) A "'(d)iagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) "Once two mental health evaluators agree that the person has a diagnosed mental disorder, and once the (secretary) has filed a petition, and the superior court has found probable cause, the individual has the right to counsel and to a jury trial." (See *In re Smith* (2008) 42 Cal.4th 1251, 1257.)

After Taylor filed his appellate briefs, the Second District Court of Appeal, Division Five, decided the issue presented here. It disagreed with the defendant's central contention that the use of the protocol-based mental health evaluations at the preliminary phases of the commitment proceedings deprived the trial court of fundamental jurisdiction to order commitment following the jury trial. The court stated, "'In general, the only act that may deprive a court of jurisdiction is the People's failure to file a petition for recommitment before the expiration of the prior commitment.' (Citations.) Moreover, even in cases involving the denial of fundamental rights in the analogous preliminary hearing stage of a criminal prosecution, it is well established that reviewing courts apply the harmless error standard set forth in *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529-530." (*People v. Castillo* (2009) 170 Cal.App.4th 1156, 1177.) The First District Court of Appeal, Division One also recently reached this same conclusion in *People v. Medina* (2009) 171 Cal.App.4th 805. We agree with this conclusion.

We have held the failure to obtain the evaluation of two mental health professionals, which is required by the closely related provision of section 6601, subdivisions (c) and (d), did not deprive a court of fundamental jurisdiction to nonetheless act on an SVP petition. (See *People v. Superior Court* (*Preciado*) (2001) 87 Cal.App.4th 1122, 1128-1130 (*Preciado* ).) We concluded this defect "was not one going to the substantive validity of the complaint, but rather was merely in the nature of a plea in abatement, by which a defendant may argue that for collateral reasons a complaint should not proceed." (*Id.* at p. 1128.) For the same reason, we reject Taylor's contention that a defect in adoption of the department's evaluation handbook somehow prevented the court from acting on respondent's petition. The requirement that the handbook meet the APA requirements is collateral to the merits of Taylor's petition.

Taylor does not challenge the sufficiency of evidence at the probable cause hearing or at trial-and the protocol played no role in his trial. The Office of Administrative Law determination is not binding on the courts, but it is entitled to deference. (*Grier v. Kizer* (1991) 219 Cal.App.3d, 422, 434-435, disapproved on other grounds by *Tidewater Marine Western, Inc., v. Bradshaw* (1996) 14 Cal.4th 557, 577.) Nonetheless, that determination did not suggest the DMH's protocol was deficient or unreliable as an instrument for assessing a person's status as a potential SVP. Instead, OAL Determination No. 19 stated the Office

of Administrative Law "has neither the legal authority nor the technical expertise to evaluate the underlying policy issues involved in" the SVPA.  Taylor's speculation that APA compliance likely will result in a materially different protocol more favorable to him does not undermine the legitimacy of his commitment following a unanimous jury verdict.  Apart from asserting the protocol's status as an "underground regulation," Taylor fails to explain how use of the protocol in the proceedings against him resulted in actual prejudice, either by depriving him of a fundamental right or a fair trial.

(Lodgment No. 4, People v. Taylor, No. D052948, slip op. at 4-6.)

Respondent first contends that Petitioner has not stated a federal claim, but has merely alleged a violation of state law.  Although Petitioner alleges in the First Amended Petition that his federal due process rights were violated by the failure to properly adopt the SVP protocol, he did not specifically argue to the state appellate or supreme court that a federal violation had resulted.  (See Lodgment No. 1 at 18-36; Lodgment No. 5 at 2-3.)  His claim was silently denied by the state supreme court and, as quoted above, the state appellate court did not explicitly mention federal due process.  However, the appellate court, in rejecting Petitioner's contention that the failure to properly adopt the SVP protocol did not deprive the trial court of jurisdiction over his SVP petition, and would require harmless error analysis in any event, relied on People v. Castillo, 170 Cal.App.4th 1156, 1177 (2009), overruled on other grounds by People v. Castillo, 49 Cal.4th 145 (2010).  The California Supreme Court in Castillo recognized: "long-established procedural due process decisions of the United States Supreme Court . . . [which] explain that substantive rights relating to 'life, liberty, and property . . . cannot be deprived except pursuant to constitutionally adequate procedures.'"  Castillo, 49 Cal.4th at 165, quoting Cleveland Board of Education v. Loudermill, 470 U.S. 532, 541 (1985).  Thus, the state court applied federal due process principles in analyzing Petitioner's claim.

Furthermore, it is clear that the basis for analyzing general due process claims in SVP proceedings in California courts is inextricably intertwined with federal due process principles.  See People v. McKee, 47 Cal.4th 1172, 1188-93 (2010) (upholding California's recent changes to the SVP law against federal due process challenge, discussing and applying Kansas v. Hendricks, 521 U.S. 346 (1997) (upholding SVP law similar to the California SVP law against due process, ex post facto and equal protection challenges), Foucha v. Louisiana, 504 U.S. 71

(1992) (upholding due process challenge to state statute which permitted confinement of mentally ill persons without a finding of dangerousness), Jones v. United States, 463 U.S. 354 (1983) (upholding statue providing for confinement of persons found not guilty by reason of insanity), and Addington v. Texas, 441 U.S. 418 (1979) (recognizing the power of a state to confine persons who, by reason of a mental disease, constitute a threat to society). Thus, although not explicitly mentioned by the appellate court, federal due process principles certainly underlie its analysis of Petitioner's due process claim. In addition, in presenting claim one to the state appellate and supreme courts, Petitioner cited state cases which apply federal due process principles, including Castillo and McKee, among others. (See Lodgment No. 1 at 18-36; Lodgment No. 5 at 4-11.) Respondent has not shown that Petitioner has failed to exhaust a claim alleging a federal due process violation, or that he has not stated a federal claim in this Court. See Peterson v. Lampert, 319 F.3d 1153, 1158 (9th Cir. 2003) (holding "that, for purposes of exhaustion, a citation to a state case analyzing a federal constitutional issue serves the same purpose as a citation to a federal case analyzing such an issue.")

Nevertheless, Petitioner has not alleged facts which, if true, would demonstrate a violation of federal due process. As the state appellate court noted, Petitioner has failed to show how the failure to properly adopt the SVP evaluation protocol through the rule-making process of the California Administrative Procedures Act had any effect whatsoever on the outcome of his commitment proceedings. The state appellate court's determination to that effect, as well as the determination that any error would be harmless for the same reason, is neither contrary to, nor involved an unreasonable application of, clearly established federal law. See Hendricks, 521 U.S. at 360 (finding that the Kansas SVP civil commitment scheme, which is very similar to California's (see Hubbart v. Superior Court, 19 Cal.4th 1138, 1157 (1999)), did not violate federal due process because mental disorder "coupled with prediction of future dangerousness, adequately distinguished [petitioner] from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.")

To the extent Petitioner alleges that the failure to enact the SVP protocol in a manner consistent with state law created a due process violation arising from the failure to properly enact

it under state law (as opposed to the substantive nature of the protocol itself creating a due process violation), his claim fails.  Errors of state law do not merit federal habeas relief.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (holding that federal habeas relief is not available merely for an alleged error in the interpretation or application of state law).  There are extreme cases where deprivation of state procedures can give rise to a federal due process violation, such as where the actions by the state court are "so arbitrary or capricious as to constitute an independent due process" violation.  Lewis v. Jeffers, 497 U.S. 764, 780 (1990).  This is not such a case, however, because, as the state appellate court observed, there is no indication whatsoever that had the SVP protocol been enacted through the state rule-making process it would have been any different than the protocol applied in Petitioner's case, or that Petitioner's SVP proceedings would have been any different in procedure or result.  Rather, the state court noted that the determination by the Office of Administrative Law that the SVP protocol was an underground regulation did not suggest that the protocol was deficient in any manner or unreliable as an instrument of assessing a person's status as a potential SVP, merely that its adoption violated state procedures.  (Lodgment No. 4, People v. Taylor, No. D052948, slip op. at 6.)  Neither has Petitioner demonstrated anything arbitrary or capricious about permitting his SVP proceedings to proceed under a protocol which had not been adopted through the state rule-making process.  In sum, Petitioner has failed to identify any clearly established federal law supporting his claim that federal due process was violated in this regard.  Because a fairminded jurist could agree with the state court's conclusion that Petitioner did not suffer a federal due process violation from the failure to adopt the SVP protocol through the state rule-making process, federal habeas relief is not available with respect to this claim.  Harrington, 131 S.Ct. at 786.

Accordingly, the Court finds that the denial of claim one by the state court was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and recommends habeas relief be denied as to this claim.  To the extent Petitioner intended to present a separate claim alleging denial of his right to counsel during his evaluations, it is discussed immediately below in connection to claim two.

/ / /

1   / / /

2   **C.     Petitioner is not Entitled to Habeas Relief as to Claim Two.**

3           Petitioner contends in claim two that he was deprived of the effective assistance of

4   counsel in violation of the Fourteenth Amendment because his trial counsel failed to: (1) file a

5   motion to have the SVP petition dismissed based on the use of illegal underground regulations;

6   (2) object to testimony by Dr. Hupka regarding statements made by Petitioner about his prior

7   offenses; (3) object to the use of the Static-99 actuarial instrument; (4) retain an expert witness;

8   and (5) argue that the SVP petition was untimely.  (FAP at 11-16.)  The Court will also consider

9   Petitioner's allegation in claim one that his right to counsel during the meetings with the

10  evaluation doctors conflicts with state law.  (Id. at 8.)

11          Respondent contends claim two is unexhausted because it was never presented to the state

12  supreme court.  (Ans. Mem. at 3-4.)   Respondent argues this claim should be denied

13  notwithstanding the failure to exhaust because it is without merit.  (Id. at 9-12.)

14          Petitioner presented the first aspect of claim one to the state appellate court on direct

15  appeal, alleging that counsel should have filed a motion to dismiss the SVP petition on the basis

16  that the proceedings were predicated on the use of underground regulations.  (Lodgment No. 1

17  at 37-39.)  The appellate court denied the claim, stating:

18                  Taylor has not shown prejudice under *People v. Pompa-Ortiz*, *supra*, 27
                Cal.3d 519; therefore, his ineffectiveness of counsel claim must fail under the
19              standard set forth in *Strickland v. Washington* (1984) 466 U.S. 668, 687-698
                (defendant must demonstrate prejudice in order to establish ineffective assistance
20              of counsel].)  "(A) court need not determine whether counsel's performance was
                deficient before examining the prejudice suffered by the defendant as a result of
21              the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on
                the ground of lack of sufficient prejudice, which we expect will often be so, that
22              course should be followed."  (*Id.* at p. 697; *In re Fields* (1990) 51 Cal.3d 1063,
                1079.)
23

24  (Lodgment No. 4, Taylor, No. D052948, slip op. at 6-7.)

25          Petitioner did not present this aspect of claim two to the state supreme court, and has

26  failed to present the remainder of his ineffective assistance of counsel allegations to any state

27  court.  In order to properly exhaust state judicial remedies, a California state prisoner must

28  generally present the California Supreme Court with a fair opportunity to rule on the merits of

1   every issue raised in his or her federal habeas petition.  28 U.S.C. § 2254(b), (c); Granberry v.

2   Greer, 481 U.S. 129, 133-34 (1987).  The petitioner must have raised the same federal claims

3   brought in the federal petition before the state supreme court.  See Duncan v. Henry, 513 U.S.

4   364, 365-66 (1995).  Applications for writs of habeas corpus that contain unexhausted claims

5   generally must be dismissed, although federal courts have the discretion to deny a habeas

6   application on the merits notwithstanding a petitioner's failure to fully exhaust state judicial

7   remedies.  Rose v. Lundy, 455 U.S. 509, 522 (1982); 28 U.S.C. § 2254(b)(2); 28 U.S.C.A.

8   § 2254(b)(2) (West 2006) ("An application for a writ of habeas corpus may be denied on the

9   merits, notwithstanding the failure of the applicant to exhaust the remedies available in the

10   courts of the State.")

11       However, even where a claim has not been presented to the state's highest court, such as

12   the ineffective assistance of counsel claims raised in the Petition here, if a petitioner no longer

13   has state court remedies available to him, he has satisfied the technical requirements of

14   exhaustion.  Cassett v. Stewart, 406 F.3d 614, 621 n.5 (9th Cir. 2005) ("A habeas petitioner who

15   has defaulted his federal claims in state court meets the *technical* requirements for exhaustion;

16   there are no state remedies any longer 'available' to him."), quoting Coleman v. Thompson, 501

17   U.S. 722, 732 (1991); see also 28 U.S.C.A. § 2254(c) (West 2006) ("An applicant shall not be

18   deemed to have exhausted the remedies available in the courts of the State, within the meaning

19   of this section, if he has the right under the law of the State to raise, by any available procedure,

20   the question presented.")  In such a situation the claim would likely be procedurally defaulted

21   in this Court.  Coleman, 501 U.S. at 735 n.1 (holding that a procedural default arises when a

22   petitioner has "failed to exhaust state remedies and the court to which the petitioner would be

23   required to present his claims in order to meet the exhaustion requirement would now find the

24   claims procedurally barred.")

25       Here, based on California's rule barring untimely petitions for post-conviction relief,

26   which the United States Supreme Court has found to be clearly established and consistently

27   applied, it appears that Petitioner no longer has state court remedies availablewith respect to any

28   ineffective assistance of counsel claim.  See Walker v. Martin, 562 U.S. ___, 131 S.Ct. 1120,

1125-31 (2011) (holding the California's timeliness requirement providing that a prisoner must seek habeas relief without "substantial delay" as "measured from the time the petitioner or counsel knew, or should reasonably have known, of the information offered in support of the claim and the legal basis for the claim," is clearly established and consistently applied), citing In re Robbins, 18 Cal.4th 770, 805 (1998) (holding that a habeas claim "that is substantially delayed" will not be considered unless "the petitioner can demonstrate 'good cause' for the delay.")

The United States Supreme Court has stated that federal habeas courts should not treat California's timeliness rules as differing significantly from other states which consider petitions untimely after unexplained delays of thirty or sixty days. Evans v. Chavis, 546 U.S 189, 199-201 (2006), citing Carey v. Saffold, 536 U.S. 214, 219 (2002). Petitioner could have presented his ineffective assistance and denial of counsel claims to the state courts in a habeas petition filed contemporaneously with his direct appeal, which was filed on September 17, 2008. (Lodgment No. 1.) Based on Petitioner's unexplained delay of nearly three years and counting, it appears that he has no state court remedies remaining for his ineffective assistance of counsel claims, all of which arose during his commitment proceedings, and he has therefore met the technical requirements of exhaustion. Cassett, 406 F.3d at 621 n.5. In any case, as discussed immediately below, Petitioner's ineffective assistance of counsel claims are without merit. Respondent's contention that the claims should be denied on their merits notwithstanding Petitioner's failure to present them to the state court is therefore well taken. See Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1992) (holding that the exhaustion requirement is generally inapplicable to claims which do not present a colorable claim for relief).[2]

---

[2] Although Petitioner's ineffective assistance of counsel claims are probably procedurally defaulted by virtue of his failure to timely present them to the state courts, Coleman, 501 U.S. at 735 n.1, Respondent has waived the affirmative defense of procedural default by failing to raise it in the Answer. Morrison v. Mahoney, 399 F.3d 1042, 1046-47 (9th Cir. 2005). As a practical matter, however, Petitioner could attempt to show cause to excuse a default by establishing constitutionally ineffective assistance of counsel. See Murray v. Carrier, 477 U.S. 478, 488 (1986). Nevertheless, because, as discussed in this section of the Report and Recommendation, Petitioner cannot establish ineffective assistance of counsel, the result is the same (federal habeas relief is not available) whether or not the Court addresses these claims on their merits, finds them to be procedurally defaulted, or determines they are unexhausted.

/ / /

For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must demonstrate two things.  First, he must show that counsel's performance was deficient. Strickland v. Washington, 466 U.S. 668, 687 (1984).  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.  Second, he must show counsel's deficient performance prejudiced the defense.  Id.  This requires showing that counsel's errors were so serious they deprived Petitioner "of a fair trial, a trial whose result is reliable."  Id.  To satisfy the prejudice prong, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error.  Williams, 529 U.S. at 406; Strickland, 466 U.S. at 694. A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  The prejudice inquiry is to be considered in light of the strength of the prosecution's case.  Luna v. Cambra, 306 F.3d 954, 966 (9th Cir.), amended, 311 F.3d 928 (9th Cir. 2002).

**1)  Failure to file motion to dismiss**

The first aspect of claim two, alleging that counsel failed to file a motion to dismiss the SVP petition on the basis that the SVP protocol had not been formally adopted through the rule-making process of the Administrative Procedures Act, is without merit for the reasons stated by the appellate court.  Petitioner is unable to demonstrate prejudice resulting from the failure to file such a motion for the same reasons discussed above with respect to claim one, namely, because he cannot demonstrate that the failure to adopt the protocol through the state rule-making process had any effect whatsoever on the outcome of the SVP proceedings.  Habeas relief is therefore unavailable, irrespective of Petitioner's failure to present the claim to the state supreme court, because Petitioner has not shown the existence of "a probability sufficient to undermine confidence in the outcome" arising from counsel's failure to file a motion to dismiss. Strickland, 466 U.S. at 694.

**2)  Failure to object to Dr. Hupka's testimony**

In the second aspect of claim two, Petitioner alleges that his trial counsel was deficient

1 in failing "to object to prejudicial statements presumably made by petitioner to state

2 psychologist." (FAP at 13.) He refers specifically to Dr. Hupka's testimony that, during their

3 interview, when Dr. Hupka commented upon the nature of the violence in Petitioner's offenses,

4 Petitioner "took great umbrage" and insisted that he had not hurt his victims, that his offenses

5 were not that bad, and that maybe he had hurt the victims' dignity but did not really damage

6 them because he did not "stab them or rip their guts out." (Trav. Mem. at 18, citing RT 221.)

7 Dr. Hupka opined that these statements, in connection to Petitioner's statement that the sex was

8 consensual, were an indirect admission of guilt by Petitioner. (RT 220-21.)

9      Respondent contends that these statements were admissible under California Evidence

10 Code sections 1220 (admission of a party), and 802 (statement of basis of an expert's opinion).

11 (Ans. Mem. at 10.) Respondent also contends that Petitioner has not established prejudice

12 arising from any error in failing to object to those statements because there was overwhelming

13 evidence supporting the finding that he qualified as an SVP. (Id.)

14      Petitioner has failed to establish ineffective assistance in connection to counsel's failure

15 to object to Dr. Hupka's testimony regarding the statements Petitioner made during their

16 interview. Even assuming a proper objection could have been raised and would have been

17 sustained, Petitioner cannot show that their introduction rendered his trial unfair.[3] Rather,

18 overwhelming evidence was introduced to establish that Petitioner had forcibly raped the

19 victims. The record reveals that Petitioner was convicted after jury trials on those charges,

20 during which he was presumably provided with all the attendant due process protections which

21 accompany a criminal trial, including the presumption of innocence, all of which were

22 overcome. He attempted to contradict the fact of those convictions by providing an implausible

23 explanation as to why an innocent man would twice be convicted of forcible rape committed by

24 ──────────

25     [3] To the extent Petitioner contends the introduction of Dr. Hupka's testimony regarding
Petitioner's statements violated federal due process (see Trav. Mem. at 19), his claim is without merit.

26 State evidentiary rulings do not give rise to claims cognizable on federal habeas proceedings unless the
evidentiary ruling violated Petitioner's due process right to a fair trial. Estelle, 502 U.S. at 70; Gordon

27 v. Duran, 895 F.2d 610, 613 (9th Cir. 1990). In order to establish a due process violation, Petitioner
must show that the trial court's rulings were so prejudicial that they rendered his trial fundamentally

28 unfair. Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996); Jammal v. Van de Kamp, 926 F.2d
918, 919 (9th Cir. 1991). Petitioner cannot make this showing for the same reason he has not
established prejudice from counsel's failure to object to the introduction of Dr. Hupka's testimony.

another man, that he suffered from "bad luck." (RT 127, 137.)  Moreover, Petitioner only denied involvement in the crimes where he and the victim were the only witnesses, and admitted involvement in the incident where he was arrested during an altercation with a woman whom he claimed was a prostitute and who had somehow ended up with her clothes off after he had agreed to buy her food.  Thus, Dr. Hupka's testimony that Petitioner had indirectly admitted guilt and made statements minimizing the violent nature of the crimes, when considered in light of the strength of the prosecution's case, which included not only the record of the prior convictions on those charges but Petitioner's failure to participate in the sex offender treatment program while housed at the state hospital for two years, does not undermine confidence in the outcome of the SVP proceedings.  Strickland, 466 U.S. at 694; Luna, 306 F.3d at 966.  The Court recommends denial of habeas relief as to this aspect of claim two irrespective of the failure to present it to any state court.

To the extent Petitioner argues that such statements would never have been made in the first place had he been afforded counsel during his interviews with the doctors, such a claim also fails.  As Respondent points out, Petitioner does not have a state law right to counsel at his mental health interviews.  (Ans. Mem. at 7, citing People v. Burns, 128 Cal.App.4th 794, 803-05 (1995) (holding that there is no right to the presence of counsel during updated SVP mental evaluation interviews.)  Moreover, there is no federal right to counsel during mental health evaluations.  Estelle v. Smith, 451 U.S. 454, 470-71 & n.14 (1981) (holding that although a defendant has a right to consult with counsel before undergoing a psychological evaluation, there is no right to counsel during the interview itself, as "an attorney present during a psychiatric interview could contribute little and might seriously disrupt the examination.")  Thus, to the extent Petitioner intended to present this allegation as a separate claim, it is without merit.  The Court recommends denial of habeas relief as to this aspect of claim two irrespective of the failure to present it to any state  court.

**3)  Failure to object to the use of the Static-99 actuarial instrument**

The third aspect of claim two alleges a failure to object to the use of the Static-99 actuarial instrument to predict the chance of future propensity to reoffend, in lieu of other

1   standard psychological tests.  (FAP at 18-19.)  Dr. Hupka testified that other standardized tests

2   "are not the kind of tests that really are helpful in answering the questions that we're asked to

3   answer in these evaluations, so they are not routinely used by anybody."  (RT 104-05.)

4   Petitioner has not identified a basis for interposing an objection to the use of the actuarial

5   instrument by the doctors, and has not shown that other tests would be more reliable.  In any

6   case, both doctors identified in detail all the factors upon which they relied in forming their

7   opinion that Petitioner posed a danger to reoffend.  (RT 69-78, 229-51.)  Petitioner has not

8   shown that the accuracy of the doctors' determinations regarding his propensity to reoffend was

9   hampered by the use of the Static-99 actuarial instrument, or that the jury was not in a position

10   to make a determination regarding whether the People had established that Petitioner was likely

11   to reoffend based on the individual factors identified by the doctors.  Thus, the failure to object

12   to the use of the Static-99 actuarial instrument does not undermine confidence in the outcome

13   of the SVP proceedings.  Strickland, 466 U.S. at 694.  The Court recommends denial of habeas

14   relief as to this aspect of claim two irrespective of the failure to present it to any state  court.

15        **4)  Failure to retain an expert**

16       The fourth aspect of claim two alleges a failure to retain an expert witness to assist

17   Petitioner's defense.  (FAP at 19.)  Petitioner contends that he asked counsel why he had not

18   retained an expert, and counsel responded that "he could not find any experts."  (Id.)  Petitioner

19   contends that he then gave counsel " a list of several expert evaluators who, if given prior notice,

20   would assist in defense examinations."  (Id.)

21       Respondent answers that Petitioner has not established that any of the experts willing to

22   "assist in defense examinations" would have provided favorable opinions, and that this Court

23   must presume that counsel made a strategic decision not to call his own expert, probably because

24   counsel could not find one favorable to Petitioner.  (Ans. Mem. at 11.)  Respondent also

25   contends that in light of the overwhelming evidence presented at the commitment proceedings,

26   Petitioner cannot establish that he would have received a more favorable outcome had he called

27   his own expert.  (Id.)

28       This aspect of claim two relies on speculation that counsel could have found an expert

witness capable of, and willing to, provide testimony favorable to Petitioner.  Speculative and conclusory allegations are insufficient to prove that counsel provided ineffective assistance. Blackledge v. Allison, 431 U.S. 63, 74 (1977); James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994). Petitioner has failed to overcome the "strong presumption that [counsel acted] for tactical reasons rather than through sheer neglect." Yarborough v. Gentry, 540 U.S. 1, 8 (2003), citing Strickland, 466 U.S. at 690 (holding that counsel is "strongly presumed" to made decision in the exercise of professional judgment).  In any case, Petitioner is unable to demonstrate prejudice. See Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir. 2001) (speculation that counsel could have retained an expert does not establish prejudice where there was no evidence that an expert would testify favorably for petitioner).  The Court recommends denial of habeas relief as to this aspect of claim two irrespective of the failure to present it to any state court.

### 5)  Failure to file motion to dismiss SVP petition as untimely

The fifth and final aspect of claim two alleges that trial counsel failed to argue that the SVP petition should have been dismissed as untimely because it was filed a year after expiration of his previous commitment. (FAP at 19-20.)  Respondent contends that the SVP petition in this case was filed over two months before Petitioner's prior commitment expired.  (Ans. Mem. at 11-12.)

Petitioner filed two pro se motions to dismiss the SVP petition on the grounds it was untimely. (CT 59-74.)  Petitioner's counsel later submitted the motions on Petitioner's behalf and the trial judge, who had apparently been assigned after the motions had been filed, agreed to look at and rule on them.  (RT 4-6.)  Petitioner is therefore unable to demonstrate deficient performance by counsel in failing to make such a motion because it was actually made, and is unable to demonstrate prejudice because the motion was in fact placed before and considered by the trial judge.

Accordingly, the Court finds that habeas relief should be denied as to claim two, irrespective of Petitioner's failure to present the claims to the state supreme court, because they are without merit.

/ / /

/ / /

**D.     Petitioner is not Entitled to Habeas Relief as to Claim Three.**

Petitioner contends in claim three that by imposing an indeterminate term of commitment which can only end when he proves he no longer poses a danger to society, the SVP law impermissibly places the burden of proof on him to prove that he is not an SVP, rather than on the government to prove that he is, in violation of federal due process.   (FAP at 17-23.) Respondent contends that the state appellate court's adjudication of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law.  (Ans. Mem. at 12-16.)

Petitioner presented claim three to the state supreme court in the petition for review. (Lodgment No. 5 at 12.)  That court issued an order which stated: "Petition for review denied." (Lodgment No. 6.)   Petitioner also presented the claim to the state appellate court on direct review.  (Lodgment No. 1 at 40-56.)  The appellate court affirmed Petitioner's commitment in an unpublished opinion.  (Lodgment No. 4.)  This Court will therefore look to the state appellate court opinion in order to determine weather the awas objectively reasonable within the meaning of 28 U.S.C. § 2254(d).  Ylst, 501 U.S. at 803-06.  The state appellate court denied the claim, stating:

> Taylor contends his indeterminate recommitment under the SVPA violates his Fourteenth Amendment right to due process and his right to due process under the California Constitution.  He maintains that due process requires that the state carry the burden of proof in all commitment proceedings, including a proceeding to continue his detention as an SVP.
>
> Prior to 2006, a person who was found to be an SVP was committed for a two-year term under the SVPA.  At the end of that term, the People were required to file another petition seeking a determination that the person remained an SVP. If the People did not file a recommitment petition, the person would have to be released.  (Former § 6604, as amended by Stats.2000, ch. 420, § 3.)  On filing of a recommitment petition, a new jury trial was conducted at which the People again had the burden to prove beyond a reasonable doubt that the person was currently an SVP.  (Former §§ 6604, 6605, subds. (d), (e); *People v. Munoz* (2005) 129 Cal.App.4th 421, 429 ("(A)n SVP extension hearing is not a review hearing.... An SVP extension hearing is a new and independent proceeding at which ... the (People) must prove the (committed person) meets the (SVP) criteria, including that he or she has a currently diagnosed mental disorder that renders the person dangerous").)
>
> In 2006, the SVPA was amended first by the Legislature and then, with the passage of Proposition 83, by the electorate.  The amended SVPA provides that

an individual who is determined to be an SVP must be "committed for an indeterminate term to the custody of the (DMH) for appropriate treatment and confinement in a secure facility." (§ 6604.) Once committed, the individual must have "a current examination of his or her mental condition made at least once every year." (§ 6605, subd. (a).) After the examination, the Department must file a report in the form of a declaration that addresses (1) "whether the committed person currently meets the definition of (an SVP)," and (2) "whether conditional release to a less restrictive alternative or an unconditional release is in the best interest of the person and conditions can be imposed that would adequately protect the community." (*Ibid.*) The Department is to file this report with the trial court that committed the person, and must serve the report on the prosecuting agency and the committed individual. The committed individual may retain, or the court may appoint, a qualified expert to examine him or her. (*Ibid.*)

If the Department concludes in the report that the committed individual no longer meets the requirements of the SVPA, or that conditional release is appropriate, the Department must authorize the committed individual to petition the trial court for release. (§ 6605, subd. (b).) Upon receipt of the petition for conditional release or unconditional discharge, the trial court is to set a probable cause hearing at which the court "can consider the petition and any accompanying documentation provided by the medical director, the prosecuting attorney or the committed person." (*Ibid.*) If the trial court determines that probable cause exists to believe the petition has merit, it must set a hearing on the issue, at which time the committed individual is "entitled to the benefit of all constitutional protections that were afforded him or her at the initial commitment proceeding." (*Id.*, subds. (c), (d).) Either side may demand a trial by jury and may retain experts to examine the committed individual. (*Id.*, subd. (d).) If the Department has authorized the individual to petition for conditional release or unconditional discharge, the state bears the burden to prove beyond a reasonable doubt that the committed individual is still an SVP. (*Ibid.*)

The Department is required to seek judicial review of an individual's commitment not only at the time of the annual examination, but at any time that the Department "has reason to believe" a committed individual is no longer an SVP. (§ 6605, subd. (f).) Similarly, if the Department determines that the committed individual's "diagnosed mental disorder has so changed that the person is not likely to commit acts of predatory sexual violence while under supervision and treatment in the community," the Department must send a report recommending conditional release of the committed individual to the trial court, the county attorney, and the committed individual's attorney. (§ 6607, subd. (a).) The trial court is required to hold a hearing on the report once it is received. (*Id.*, subd. (b).)

After the first year of commitment, a committed individual may petition the trial court for conditional release or unconditional discharge even without the "recommendation or concurrence" of the Department. (§ 6608, subds. (a), (c).) The committed individual is entitled to the assistance of counsel in preparing and filing the petition. The individual must serve the Department with the petition. (*Id.*, subd. (a).) After receiving such a petition, the trial court "shall endeavor whenever possible to review the petition and determine if it is based upon frivolous grounds and, if so, shall deny the petition without a hearing." (*Ibid.*)

If, after receiving a petition filed by an individual without the recommendation or concurrence of the Department, the trial court determines that a hearing is appropriate, the committed individual has the burden of proving by a preponderance of the evidence that the petition should be granted. (§ 6608,

subd. (i).)  If the trial court determines that the committed individual "would not be a danger to others due to his or her diagnosed mental disorder while under supervision and treatment in the community," the trial court must order that the individual be placed in a state-operated forensic conditional release program. (*Id.*, subd. (d).)  The court retains jurisdiction of the person throughout the course of the conditional release program and, at the end of one year, the court must hold a hearing to determine whether the individual should be unconditionally released from commitment.  (*Ibid.*)  If the trial court denies the petition, the committed individual must wait a year before petitioning the trial court again. (*Id.*, subd. (h).) The trial court must deny any subsequent petition filed by that individual "unless it contains facts upon which a court could find that the condition of the committed person had so changed that a hearing was warranted."  (*Id.*, subd. (a).)

As a result of Proposition 83's amendment to section 6604 making an SVP's commitment term indeterminate, as opposed to a two-year term, an SVP now remains committed, either fully or in a conditional release setting, "until he successfully bears the burden of proving he is no longer an SVP or the (DMH) determines he no longer meets the definition of an SVP." (*Bourquez v. Superior Court* (2007) 156 Cal.App.4th 1275, 1287.)

"[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." (*Addington v. Texas* (1979) 441 U.S. 418, 425 (*Addington*).) "Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." (*Foucha v. Louisiana* (1992) 504 U.S. 71, 79 ( *Foucha* ).)

For an initial civil commitment, due process requires that the state prove by clear and convincing evidence both that the person is mentally ill and that the commitment is required for his or her own welfare or for the protection of others. (*Kansas v. Hendricks* (1997) 521 U.S. 346, 358; *Addington*, *supra*, at pp. 426 427, 432 433.)  Once the person has been committed, due process permits the state to hold the person only as long as he or she is both mentally ill and dangerous, but no longer.  (*Foucha*, *supra*, at pp. 71-78 (continuing to hold dangerous person who is no longer mentally ill violates due process); *Jones v. United States* (1983) 463 U.S. 354, 368, 370 (*Jones* ) ("acquittee is entitled to release when he has recovered his sanity or is no longer dangerous").)

Taylor relies primarily on *Foucha*, *supra*, at p. 71 for his argument that sections 6605 and 6608 improperly place the burden on him to prove that he should be released, rather than placing the burden of proof on the state to prove that he is still an SVP.  In *Foucha*, the United States Supreme Court considered the constitutionality of a Louisiana statute that provided for the indefinite involuntary commitment of individuals found not guilty by reason of insanity who were determined to be dangerous, but not mentally ill.  The trial court had determined that the defendant had a personality disorder that was not considered a mental illness or, for that matter, a treatable disorder.  There was testimony that the defendant was not suffering from either a neurosis or psychosis, and the state was "not claim(ing) that Foucha is now mentally ill." (*Id.* at p. 75, 80.)  The court found that "a law like Louisiana's, which permits the indefinite detention of insanity acquittees who are not mentally ill but who do not prove they would not be dangerous to others," violated the Due Process clause.  (*Foucha*, *supra*, at p. 83.)

*Foucha* prohibits the continued confinement of insanity acquittees who are no longer mentally ill, particularly in a situation in which the state has not proven, by clear and convincing evidence, that the individual poses a danger to the

community.  *Foucha* does not address the burden of proof that would apply at future release hearings, after the state had already established beyond a reasonable doubt that the individual is mentally ill and poses a danger, and thus does not support Taylor's due process challenge to section 6608's provision that places the burden on him to prove by a preponderance of the evidence that he is entitled to release because he no longer meets the SVP criteria.

In *Jones*, *supra*, 463 U.S. at pages 357, 366-368, the insanity acquittee bore the burden of proving, by a preponderance of the evidence, that he was no longer mentally ill or dangerous. The *Jones* court observed, "The statute provides several ways of obtaining release. Within 50 days of commitment the acquittee is entitled to a judicial hearing to determine his eligibility for release, at which he has the burden of proving by a preponderance of the evidence that he is no longer mentally ill or dangerous. (Citation).  If he fails to meet this burden at the 50-day hearing, the committed acquittee subsequently may be released, with court approval, upon certification of his recovery by the hospital chief of service. (Citation.)  Alternatively, the acquittee is entitled to a judicial hearing every six months at which he may establish by a preponderance of the evidence that he is entitled to release." (*Jones*, *supra*, 463 U.S. at pp. 356-357, fn. omitted.)  The *Jones* court thus implicitly approved a review procedure similar to the one at issue here.

The initial commitment hearing under the Act provides a significant level of due process protection by requiring a finding beyond a reasonable doubt that the individual meets the SVP criteria.  The required periodic reviews of a committed individual's mental health status and the procedures that permit these individuals to petition for release minimize the risk of an erroneous deprivation of liberty.  Accordingly, we conclude there was no due process violation.

(Lodgment No. 4, People v. Taylor, No. D052948, slip op. at 7-13.)

Respondent correctly points out that there is no clearly established federal law which prohibits California from assigning the burden to Petitioner to establish that he is no longer an SVP after he has been committed under the SVP commitment proceedings.  See Wright v. Van Patten, 552 U.S. 120, 125 (2008) (holding that a state court adjudication is not contrary to or an unreasonable application of clearly established federal law where no Supreme Court decision "squarely addresses the issue" or gives a "clear answer to the question presented."); Carey v. Musladin, 549 U.S. 70, 73-76 (2006) (holding that because the Supreme Court had never addressed the effect of the particular conduct at issue on a defendant's fair trial rights, it was "an open question in our jurisprudence" and there was no clearly established federal law on the issue).  Moreover, as the state appellate court pointed out, the Supreme Court in Jones rejected a federal due process challenge to a state law which provided that the petitioner bore the burden of proof to show that he is no longer insane in order to obtain release.  Jones, 463 U.S. at 356-57.

1  Thus, to the extent there is any clearly established federal law on the issue, it cuts against

2  Petitioner's position. The state court did not unreasonably apply clearly established federal law

3  to this claim because it did not "unreasonably extend[] a legal principle from [Supreme Court]

4  precedent to a new context where it should not apply or unreasonably refuse[] to extend that

5  principle to a new context where it should apply." Williams, 529 U. S at 407. Accordingly, the

6  adjudication of claim three by the state appellate court was neither contrary to, nor involved an

7  unreasonable application of, clearly established federal law. Id.; Jones, 463 U.S. at 356-57. The

8  Court therefore recommends habeas relief be denied as to claim three.

9  **E.      Petitioner is not Entitled to Habeas Relief as to Claim Four.**

10        Petitioner contends in claim four that the SVP law violates his right to equal protection

11  under the state and federal constitutions. (FAP at 24-32.) Respondent contends that the state

12  appellate court's denial of this claim was neither contrary to, nor involved an unreasonable

13  application of, clearly established federal law. (Ans. Mem. at 17-24.)

14        Petitioner presented this claim to the state supreme court in the petition for review.

15  (Lodgment No. 5 at 12.) That court issued an order which stated: "Petition for review denied."

16  (Lodgment No. 6.) Petitioner presented the claim to the state appellate court on direct review.

17  (Lodgment No. 1 at 57-77.) The appellate court affirmed Petitioner's commitment in an

18  unpublished opinion. (Lodgment No. 4.) This Court will therefore determine whether the state

19  appellate court opinion was objectively reasonable within the meaning of 28 U.S.C. § 2254(d).

20  Ylst, 501 U.S. at 803-06. The state appellate court denied the claim, stating:

21              Taylor contends the SVPA violates state and federal guarantees of equal
          protection because defendants are treated differently from those offenders civilly
22          committed under other statutes like the Lanterman-Petris-Short (LPS) Act (section
          5300 *et seq.*) relating to confinement for imminently dangerous persons; the
23          mentally disordered offender (MDO) statute (Pen.Code, § 2960, *et seq.*) and the
          scheme for those found not guilty by reason of insanity (NGI) (Pen. Code, § 1026,
24          *et seq.*).

25              This court summarized Proposition 83's changes to the Act in *People v.
          Shields* (2007) 155 Cal.App.4th 559 (*Shields.*)   We explained that under
26          Proposition 83, "former section 6604 was amended to eliminate the two-year term
          provision and to provide for an indeterminate term of confinement (subject to the
27          SVP's right to petition for release)." (*Shields*, at p. 562.) Section 6604 of the Act
          now provides in relevant part: "If the court or jury determines that the person is
28          a sexually violent predator, the person shall be committed for an *indeterminate*
          term to the custody of the (DMH) for appropriate treatment and confinement...."

(Italics added.)  Proposition 83 did not change section 6604's requirement that a person's commitment as an SVP be proved at trial beyond a reasonable doubt. (§ 6604.)

> "The statements of intent contained in Proposition 83 confirm the obvious intent of the Legislature in amending section 6604.  The Proposition expressly sets forth the intent to strengthen SVP confinement laws: "'(E)xisting laws that provide for the commitment and control of sexually violent predators must be strengthened and improved. [¶] ... [¶] It is the intent of the People of the State of California in enacting this measure to strengthen and improve the laws that punish and control sexual offenders."'  (Citation.)  More specifically, Proposition 83 states that the change from a two-year term to an indeterminate term is designed to eliminate automatic SVP trials every two years when there is nothing to suggest a change in the person's SVP condition to warrant release: "'The People find and declare each of the following: (¶) ... (¶) (k) California is the only state, of the number of states that have enacted laws allowing involuntary civil commitments for persons identified as sexually violent predators, which does not provide for indeterminate commitments.  California automatically allows for a jury trial every two years irrespective of whether there is any evidence to suggest or prove that the committed person is no longer a sexually violent predator.  As such, this act allows California to protect the civil rights of those persons committed as a sexually violent predator while at the same time protect society and the system from unnecessary or frivolous jury trial actions where there is no competent evidence to suggest a change in the committed person."'"  (*Shields*, *supra*, 155 Cal.App.4th at p. 564, quoting Historical and Statutory Notes, 47A West's Ann. Pen.Code (2007 supp.) foll. § 209, p. 430 (now Historical and Statutory Notes, 47C West's Ann. Pen.Code (2008 ed.) foll. § 209, p. 52) & Prop. 83, §§ 2(h), 2(k), 31.)

> "The initial inquiry in any equal protection analysis is whether persons are 'similarly situated for purposes of the law challenged.'"  (*In re Lemanuel C.* (2007) 41 Cal.4th 33, 47; *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 (Cooley ).)  The question is whether the state has adopted a classification that affects similarly situated groups in an unequal manner.  (*Cooley*, at p. 253.)  "A statute does not violate equal protection when it recognizes real distinctions that are pertinent to the law's legitimate aims."  (*In re Marriage Cases* (2008) 43 Cal.4th 757, 873.)  Indeed, California "'may adopt more than one procedure for isolating, treating, and restraining dangerous persons; and differences will be upheld if justified.  (Citations.)  Variation of the length and conditions of confinement, depending on degrees of danger reasonably perceived as to special classes of persons, is a valid exercise of (state) power.'"  (*People v. Hubbart* (2001) 88 Cal.App.4th 1202, 1217, quoting *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 172.)  "Strict scrutiny is the appropriate standard against which to measure claims of disparate treatment in civil commitment."  (*People v. Green* (2000) 79 Cal.App.4th 921, 924.)  Under this standard, the state has the burden of establishing it has a compelling interest that justifies the law and that the distinctions, or disparate treatment, made by that law are necessary to further its purpose.  (*Warden v. State Bar* (1999) 21 Cal.4th 628, 641; see also *People v. Buffington* (1999) 74 Cal.App.4th 1149, 1156.)

> In our view, SVPs are not similarly situated to those committed under the MDO, LPS and NGI schemes for the purposes of an equal protection analysis.  There are notable differences among those schemes regarding their purposes, the degree and type of danger posed by individuals committed under them, and the severity of the individuals' mental illnesses and their prognosis.  For example,

those involuntarily committed under the LPS include individuals who have not committed any crime. (§ 5300.5, subd. (b).)

To a significant degree, SVPs are civilly committed because of the likelihood they will engage in future sexually violent criminal acts. (See Ballot Pamp., Gen. Elec. (Nov. 7, 2006) text of Proposition 83, p. 127 ("Sex offenders have very high recidivism rates. According to a 1998 report by the U.S. Department of Justice, sex offenders are the least likely to be cured and the most likely to reoffend....")  Therefore, SVPs pose a substantial danger to the community.  By contrast, the other classification groups may include individuals whose mental illnesses are of shorter duration, less recurrent, and more amenable to successful treatment.  (See, e.g., *People v. Buffington, supra,* at p. 1163 (determining that SVPs and MDOs are not similarly situated for purposes of equal protection based on differential treatment requirements).)

Even if we assume that SVPs, MDOs, NGIs and LPSs are similarly situated for the purpose of the asserted equal protection claim, we conclude California has shown a compelling interest in imposing an indeterminate commitment term for SVPs.  Before the Proposition 83 amendments, the California Supreme Court observed that the SVP law "narrowly targets 'a small but extremely dangerous group' of sexually violent predators that have diagnosable mental disorders (who) can be identified while they are incarcerated."  (*Cooley, supra,* 29 Cal.4th at p. 253.)  "The problem targeted by the Act is acute, and the state interests-protection of the public and mental health treatment-are compelling."  (*Hubbart v. Superior Court, supra,* at p. 1153, fn. 20.)  When voters passed Proposition 83, they had before them the facts that sex offenders "prey on the most innocent members of our society"; that such offenders "have very high recidivism rates" and are the "least likely to be cured and the most likely to reoffend." (Historical and Statutory Notes, 47C West's Ann. Pen. Code (2008 ed.) foll. Pen. Code § 209, p. 52; see Ballot Pamp., Gen. Elec. (Nov. 7, 2006) text of Prop. 83, p. 127.)

We do not agree with Taylor that the circumstances in *Baxtrom v. Herold* (1966) 383 U.S. 107 are apposite.  In *Baxtrom,* the court found an equal protection violation when the state deprived a prisoner of a jury trial and finding of dangerousness when it sought to civilly commit him at the end of his prison term, in view of the fact these protections were available to other civilly-committed persons.  (*Baxtrom,* 383 U.S. at p. 111; see *In re Smith* (2008) 42 Cal.4th 1251, 1264.)  The SVPA, however, does not deprive persons subject to an initial commitment petition of a jury trial or finding of present inability to control sexually violent behavior. (§ 6604.) Further, under the SVPA, an SVP committed to an indeterminate term has the opportunity for meaningful judicial review via annual petitions for release, provided they are not frivolous and are supported by sufficient factual allegations.  (§§ 6605, 6608.)

We conclude the characteristics of dangerousness and amenability to treatment recognized by the Proposition 83 voters justify any disparate treatment of SVPs from those civilly committed under the MDO, LPS and NGI schemes. The voters intended to enhance the confinement of SVPs, eliminating automatic SVP trials every two years when there is nothing to suggest a change in the person's condition to warrant release. (*Shields, supra,* 155 Cal.App.4th at pp. 563-564.)  These voters reasonably concluded based on the above-referenced considerations that SVPs should be committed to indeterminate terms, subject to hearings on petitions for release at which they may bear the burden to prove by a preponderance of the evidence that they are no longer SVPs.  Because imposition of an indeterminate term for SVPs under the amended Act has been shown necessary to further compelling state interests, the amended Act does not violate

1  state and federal constitutional rights to equal protection under the law.

2  (Lodgment No. 4, People v. Taylor, No. D052948, slip op. at 13-18.)

3  "The Equal Protection Clause of the Fourteenth Amendment commands that no State

4  shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

5  essentially a direction that all persons similarly situated should be treated alike." City of

6  Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985); Shaw v. Reno, 509 U.S.

7  630 (1993). The inquiry is whether California treats all similarly situated detainees the same.

8  See Addington, 441 U.S. at 431 ("The essence of federalism is that states must be free to develop

9  a variety of solutions to problems and not be forced into a common, uniform mold.") Even if

10  Petitioner was treated differently than other similarly situated detainees in California, the state

11  could justify that treatment by showing a rational basis for the disparity. City of Cleburne, 473

12  U.S. at 440; San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 55 (1973) ("The

13  constitutional standard under the Equal Protection Clause is whether the challenged state action

14  rationally furthers a legitimate state purpose or interest.").

15  As quoted above, the state appellate court discussed at length its rationale for finding that

16  SVPs such as Petitioner are not similarly situated to persons confined as imminently dangerous

17  persons, as mentally disordered offenders, or as those found not guilty by reason of insanity. In

18  Hubbart v. Knapp, 379 F.3d 773, 781-82 (9th Cir. 2004), the Ninth Circuit accepted the reasons

19  given by the California Court of Appeal in that case, which are nearly identical to the ones given

20  by the appellate court here, for justifying the distinction between mentally disordered offenders

21  and SVP detainees, and held that the state court's rejection of the equal protection claim on that

22  basis did not conflict with clearly established federal law. Id. at 781-82, citing Hendricks, 521

23  U.S. at 359 (rejecting equal protection challenge to Kansas SVP law) and United States v.

24  Sahhar, 917 F.2d 1197, 1202 (9th Cir. 1990). The Hubbart Court also found that the appellate

25  court's determination in that case, just as here, that even if SVPs are similarly situated to other

26  types of detainees, the SVP law "is narrowly tailored to further the state's compelling interest

27  in identifying and containing sexually violent prisoners," does not violate equal protection

28  guarantees and is consistent with clearly established federal law in that regard. Hubbart, 379

1   F.3d at 781-82, <u>citing</u> <u>Hendricks</u>, 521 U.S. at 372 and <u>Addington</u>, 441 U.S. at 426.

2   / / /

3        Petitioner has made no attempt to distinguish this controlling precedent.  <u>See</u> <u>Duhaime</u>

4   <u>v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 2000) (holding that Ninth Circuit cases may be

5   persuasive authority for purpose of determining whether a particular state court decision is an

6   unreasonable application of Supreme Court law and may be relevant to determining what law

7   is clearly established).  The appellate court's determination that Petitioner was not denied equal

8   protection is nether contrary to, nor an unreasonable application of, clearly established federal

9   law.  The Court therefore recommends habeas relief be denied as to claim four.

10   **F.**     **Petitioner is not Entitled to Habeas Relief as to Claim Five.**

11        Petitioner contends in his fifth and final claim that the SVP law violates state and federal

12   ex post facto principles.  (FAP at 33-35.)  Respondent contends that Petitioner's failure to

13   present the claim to the state supreme court renders it unexhausted.  (Ans. Mem. at 3-4.)

14   Respondent also contends that the state appellate court's determination that the claim fails on

15   its merits is neither contrary to, nor involved an unreasonable application of, clearly established

16   federal law.  (<u>Id.</u> at 24-28.)

17        Although Petitioner presented this claim to the state appellate court on direct review

18   (Lodgment No. 1 at 78-86), it was not included in the petition for review filed in the state

19   supreme court.  (Lodgment No. 5 at 12.)  The appellate court denied the claim, stating:

20
21        Taylor also argues the changes made to the SVPA convert the statute from one concerned about commitment for treatment to one concerned about punishment, in violation of the ex post facto and double jeopardy laws.

22
23        Article I, section 10, of the United States Constitution provides: "No State shall ... pass any ... ex post facto Law...."  The constitutional ban on ex post facto legislation "prohibits only those laws which 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" (*Hubbart v. Superior Court, supra*, 19 Cal.4th 1138, at pp. 1170-1171, italics omitted, quoting *Collins v. Youngblood* (1990) 497 U.S. 37, 41-44 (*Collins* ).)

24
25
26        In *People v. Bright* (1996) 12 Cal.4th 652, 660 (*Bright*), overruled on other grounds in *People v. Seel* (2004) 34 Cal.4th 535, 550, footnote 6, the California Supreme Court explained that, "(t)he double jeopardy clauses of the Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, and article I, section 15, of the California Constitution, guarantee that a person shall not be placed twice 'in jeopardy' for the 'same offense.'  The double jeopardy bar protects against a second prosecution for the

27
28

same offense following an acquittal or conviction, and also *protects against multiple punishment for the same offense.*"  (*Bright*, at p. 660, Emphasis added.)  A subsequent appellate court case (*People v. Carlin* (2007) 150 Cal.App.4th 322, 348) rejected a double jeopardy challenge to the SVPA based on *Hubbart v. Superior Court*.  We find nothing in the amendments of the SVPA contained in Senate Bill 1128 and Proposition 83 to alter the conclusion reached in *Hubbart v. Superior Court* and *Carlin*.

As the court pointed out in *Hubbart v. Superior Court*, the legislative characterizations of a law play a critical role in determining whether or not a law inflicts punishment within the meaning of *Collins*, *supra*, 497 U.S. at page 43.  (*Hubbart v. Superior Court, supra*, 19 Cal.4th 1138, at p. 1171.)  The court noted, among other things, that the SVPA legislative scheme makes clear that persons eligible for commitment as SVPs "are to be viewed 'not as criminals, but as sick persons'" pursuant to section 6250.  (*Hubbart v. Superior Court*, at p. 1171.)  Furthermore, "(c)onsistent with these remarks, the SVPA was placed in the Welfare and Institutions Code, surrounded on each side by other schemes concerned with the care and treatment of various mentally ill and disabled groups." (*Ibid.*)  The court also relied on the ex post facto analysis in *Hendricks*, *supra*, 521 U.S. at pages 361-368, which found the Kansas Act did not inflict punishment within the meaning of the ex post facto clause. (*Hubbart v. Superior Court, supra*, at pp. 1171-1175.)  Also, as we have already noted, the Legislature in 1996 intended that SVPs "be committed and treated for their disorders only as long as the disorders persist and not for any punitive purposes" (Stats.1995, ch. 763, § 1).  Nothing in the statute's amendments indicates an alteration of this intent.  We conclude that defendant's ex post facto and double jeopardy rights were not violated by the amended SVPA.

(Lodgment No. 4, <u>People v. Taylor</u>, No. D052948, slip op. at 18-20.)

The appellate court correctly concluded that the United States Supreme Court has found that SVP laws such as California's do not violate ex post facto principles because they are civil in nature and do not punish for past criminal behavior.  <u>Seling v. Young</u>, 531 U.S. 250, 267 (2001); <u>Hendricks</u>, 521 U.S. at 361-69.  The <u>Hendricks</u> Court also addressed the concern apparently raised by Petitioner here of the possibility of indefinite detention because there is no cure or available treatment for his illness (or, as he believes, he has no illness), and rejected that as a basis for finding an ex post facto violation.  <u>Hendricks</u>, 521 U.S. at 366.

Habeas relief is unavailable with respect to this claim as it is without merit.  Accordingly, the Court recommends denying habeas relief as to claim five notwithstanding Petitioner's failure to raise it in the state supreme court.

## VI.

## <u>CONCLUSION AND RECOMMENDATION</u>

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court

issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **August 29, 2011**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **September 9, 2011.**  The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED: August 12, 2011

Peter C. Lewis
U.S. Magistrate Judge
United States District Court

CC:     ALL PARTIES